755 F.2d 931
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
THOMAS G. DARIN, PLAINTIFF-APPELLANT,
v.
GENERAL MOTORS CORPORATION, AND AMALGAMATED LOCAL 114,
U.P.G.W.S., DEFENDANT-APPELLEES.
 NO. 84-1073
 United States Court of Appeals, Sixth Circuit.
 1/16/85
 
 On Appeal From The United States District Court for the Eastern District of Michigan
 BEFORE: KEITH and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Plaintiff-appellant, Thomas Darin, filed this action on March 8, 1983, in United States District Court for the Eastern District of Michigan, alleging that he had been unfairly represented by codefendant-appellee, United Plant Guard Workers of America (UPGWA), local union resulting in his layoff from employment with codefendant-appellee, General Motors Corporation (GM), effective December 31, 1981. Plaintiff alleged that his layoff was wrongful because he was a Second Shift Alternate Committeeman entitled to superseniority under paragraph 11 of the GM-UPGWA Master Agreement. Jurisdiction of this action rests upon Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185.
 
 
 2
 Defendants moved for summary judgment on the basis that (1) plaintiff failed to exhaust his internal union remedies; (2) the action is barred by the applicable six month statute of limitations; and (3) the Union did not breach its statutory duty of fair representation. General Motors also argued that regardless of the District Court's determination regarding these issues, no Section 301 action could be maintained against it because the pertinent collective agreement was indisputedly not breached. On January 18, 1984, a hearing on defendants' motions was held. The district court entertained extensive argument and gave plaintiff the benefit of the doubt as to all factual allegations arguably in dispute. Further, to avoid the statute of limitations bar, Judge Guy allowed plaintiff a very liberal interpretation and construction of the acts underpinning his claim that the union breached its duty of fair representation.
 
 
 3
 The court agreed with the Union's argument and dismissed the entire action on grounds the alleged union conduct did not constitute a breach of the duty of fair representation. The court did not consider GM's separate and distinct argument that the action against the company should be dismissed because there was no breach of contract. Plaintiff appeals from this decision. For the reasons stated below, we affirm.
 
 
 4
 Appellee UPGWA, Amalgamated Local No. 114 is an unincorporated local 'labor organization' as that term is defined and used in the Labor Management Relations Act, 29 U.S.C. Sec. 141, et. seq. At the time this dispute arose and continuing to date, the Union has been the exclusive bargaining representative for the security workers employed by the defendant GM at its Detroit Diesel Allison Plant located in Redford, Michigan. Appellant Thomas Darin was a member of that plant security bargaining unit and was a member of the Union when the operative facts of this dispute occurred.
 
 
 5
 The Union and the employer were parties to two collective bargaining agreements applicable to the security employees in the bargaining unit. The first, known as the 'International' or 'Master' Agreement is dated October 1, 1979. This agreement covers security employees represented by the Union and employed by the employer nationwide. The second agreement, referred to as the 'Local' or 'Unit' Agreement covers only the security employees employed at the Detroit Diesel Division plant in Redford, Michigan. The parties agree that these Agreements were effective during this dispute and were applicable to the plaintiff.
 
 
 6
 Plaintiff Thomas Darin was employed by the Redford plant as a security guard on or about May 28, 1978. He became a member of the Union at that time, and was immediately assigned to the Redford Diesel Plant. The security employees at the Redford Diesel Plant are represented by various Union officials at the unit level, including a shop chairman and committee persons, with alternates, for each shift. These representatives are unit security guards who volunteer for duty as a Union officer. These unit representatives are nominated and run for their offices annually. The members of the bargaining unit elect their own unit Union representatives. Unit representatives differ from Local 114 officers such as President Jack Owens, who is elected by the local Union membership at-large.
 
 
 7
 After yearly unit elections, all ballots are counted, the results are certified, and both are sent to the local union. The local must then provide management with a written list of the new unit representatives pursuant to paragraph 8 of the Master collective bargaining agreement which provides:
 
 
 8
 The names of the committeemen, alternative committeemen, and the Chairman of the Committee, will be given to Management in writing signed by the President of the Local, or if authorized in writing by the President of the Local, such changes will be honored when requested in writing by the Chairman of the Committee.
 
 
 9
 These notices are ordinarily sent once the Union is notified by each plant unit of the results of their unit elections. A copy of the written notice is also sent to each individual representative.
 
 
 10
 In 1981, pursuant to the Master collective bargaining agreement, the Shop Chairman, Committeemen and Alternate Committeemen were subject to the 'superseniority' provision regarding layoffs provided for by Paragraph 11 of the Master agreement which reads as follows:
 
 
 11
 When there is a reduction in force, the committeeman and alternate committeeman will be retained at work regardless of service if they can do the available work. Rules providing for layoff of committeemen in accordance with their service may be negotiated locally.
 
 
 12
 There is no dispute that the above language applied to the unit representatives at the employer's Redford Diesel Plant. No exception to the provision was negotiated in the local collective bargaining agreement.
 
 
 13
 In March 1981, the security bargaining unit at the Redford plant conducted elections for their unit representatives. Nominating sheets were posted and unit employees given an opportunity to sign up for any of the representative positions. Plaintiff ran unopposed for the position of second shift alternate committeeman.
 
 
 14
 The union contends that it never received the results of the 1981 unit elections from the Redford Plant except for the Shop Chairman's position. The Union was unable to find any of the documentation generated by an election such as nomination sheets or other correspondence between the Union and the 1980-1981 unitrepresentatives. Accordingly, no records exist of the Union notifying the employer, pursuant to paragraph 11 of the Master Agreement, that plaintiff was elected as the second shift alternate committeeman for the 1981-1982 term.
 
 
 15
 Plaintiff had been a second shift alternate committeeman in 1979-1980 and recalled receiving notification from the Union. Failure to receive similar notification in 1981 concerned the plaintiff. Some months after the election, the plaintiff spoke to David Grieves, the 1981-1982 second shift committeeman. He was concerned that he had not received any notice from the Union confirming his position as the alternate committeeman. Grieves noted that he too had not received notice from the Union but told the plaintiff not to worry because it occasionally took quite a while for the Union to send that information.
 
 
 16
 On or about December 15, 1981, the plaintiff was notified that, effective January 1, 1982, he would be laid off. On December 18, 1981, the plaintiff again approached David Grieves and inquired about his impending layoff. Plaintiff claims that he had previously read the Master collective bargaining agreement and knew he was protected by the superseniority provision of paragraph 11 by virture of his status as the second shift alternate committeeman. However, the plaintiff asked Grieves whether he thought alternate committeemen were protected from layoff. According to plaintiff, Grieves said that he had spoken to Local Union President Jack Owens and that Owens thought alternates were not protected.
 
 
 17
 The plaintiff then approached Shop Chairman Ed Norwood a couple of days later and asked him the same question. Norwood supposedly told the plaintiff that he too had spoken to Owens and Owens indicated that alternates were not protected by superseniority. After receiving this information appellant, apparently with Grieves and Norwood, checked the collective bargaining agreements again. The plaintiff recalls that 'we all pulled out the contract book and looked at it and it didn't state that I was not protected except under local language changes which none of us were aware of any (sic).' Jt. App. at 151.
 
 
 18
 The plaintiff-appellant had no further conversations with his fellow unit representatives, Union officers or Employer representatives between December 15, 1981 and January 1, 1982. Though no one from the unit informed him that he could not file a grievance, plaintiff filed no grievance disputing his impending layoff. Plaintiff was laid off effective January 1, 1982 and returned to work on May 3, 1982. Plaintiff did not talk with unit representatives, Union officials or employer representatives during that time nor did he file a grievance disputing his layoff.
 
 
 19
 Appellant returned to work at the Redford Plant on May 3, 1982. At that time, plaintiff claims he was approached by unit representative Theodore Davis and John Paneretos (1982-1983 alternate shop chairman). According to plaintiff, Davis said that he had spoken to Owens who had indicated that the plaintiff should not have been laid off because of his superseniority. The plaintiff then asked Paneretos to look into the matter.
 
 
 20
 Appellant filed a grievance protesting his layoff on July 19, 1982, despite representations made by Otis Ponder, the 1982-1983 shop chairman, that any grievance filed at that time would be untimely under the contract. The grievance was processed through the first two steps of the grievance procedure and was eventually withdrawn because (a) of the timeliness problem; and (b) the Union's inability to prove that the plaintiff had, in fact, been elected to a representative status. The employer likewise raised Ponder's concern for timeliness during the grievance procedure.
 
 
 21
 Appellant alleges three grounds by which the union failed to represent him fairly. First, Darin alleges that the union breached a duty to investigate by failing to adequately investigate the circumstances surrounding his layoff in December of 1981. Second, appellant alleges that the Union breached its duty of fair representation when, at the time of his layoff, the Union personnel failed to consult with or refer to specific provisions of the collective bargaining agreements before wrongly advising appellant that he was not protected from layoff. Finally, appellant contends that the union breached its duty of fair representation by failing to fulfill its contractual obligation to provide the company with written notice of appellant's representative capacity as a union official.
 
 
 22
 The trial court correctly concluded that plaintiff's entire case could be condensed into one issue; namely whether the Union's failure to notify the employer of the plaintiff's official status was a breach of the duty of fair representation. The court found that even if Local President Jack Owens did misinterpret the collective bargaining agreement and even if the plaintiff's fellow unit representatives did not diligently investigate his problem in December 1981, these alleged deficiencies were cured once the Union accepted and processed plaintiff's grievance.
 
 
 23
 In arriving at this conclusion, the trial court correctly noted that the underlying facts to the dispute became fixed when the Union did not inform the employer of the plaintiff's union representative status. Nothing the Union did or did not do between December 1981 and July 19, 1982, could change the basic complexion of the layoff dispute. The fact remained, in December 1981 and July 1982, that the employer had not been informed of plaintiff's status after unit elections in the Spring of 1981.
 
 
 24
 Furthermore, the appellant had notice that the Union had failed to n tify the plant of his status as a unit representative. Appellant knew before December 15 when he was notified of his upcoming layoff, that the Union had failed to inform management of his status. Appellant was never barred from filing a grievance. Despite these circumstances, Darin failed to take advantage of the established grievance procedure until July 1982. Appellant admitted this failure while being deposed:
 
 
 25
 Q. Were you aware of this provision in the contract on December 15, 1981?
 
 
 26
 A. Yes, I was.
 
 
 27
 Q. Were you aware of that provision in the contract prior to December 15, 1981?
 
 
 28
 A. Yes, I was.
 
 
 29
 Q. How long if you can recall before December 15, 1981, had you known about that provision in the agreement?
 
 
 30
 A. I imagine for quite some time.
 
 
 31
 Q. Were you aware of that provision in the agreement during the first time you held office?
 
 
 32
 A. I believe I was, yes.'
 
 
 33
 Jt. App. at 147.
 
 Further:
 
 34
 Q. If you knew what the contract said and you believed that to be true why didn't you file a grievance?
 
 
 35
 A. Well, I can't file a grievance on my own behalf, my committeeman would have to do that.
 
 
 36
 Q. Did you ask your committeeman to file a grievance?
 
 
 37
 A. Well, I asked should I file a grievance and he said no.
 
 
 38
 Q. You asked him to file a grievance?
 
 
 39
 A. No, I asked if he thought we should file a grievance?
 
 
 40
 Q. And your testimony today is that he specifically told you that we should not file a grievance?
 
 
 41
 A. I can't remember him specifically saying no do not file a grievance, but he did specifically say that Owens said I wasn't covered, you are not covered.'
 
 
 42
 Jt. App. at 152.
 
 Finally:
 
 43
 Q. Again, I ask you did you consider your layoff in December 1981 based upon your knowledge of the wording of the contract to be a blatant violation of the agreement?
 
 
 44
 A. I believed it to be unjust, yes.
 
 
 45
 Q. Yet you did not file a grievance?
 
 
 46
 A. No. Who was I to file a grievance against?
 
 
 47
 Jt. App. at 173.
 
 
 48
 It was appellant's duty to exhaust his contractual remedies in a timely fashion. The plaintiff had ample authority, knowledge and time to file a timely grievance when his layoff first occurred. The master collective bargaining agreement places the burden on the employee to initiate the grievance mechanism. It has been conceded by appellant that he did not do so. Darin admits that he did not approach the Union until he returned to work in May 1982 about his layoff even though as early as December 18, 1981, he was armed with the knowledge of the contract's protections. As a reasonable, educated man, with the knowledge of the contract and its grievance procedure, and convinced of his interpretation of the contract's protections, the appellant should have at least completed his own investigation. Appellant's inaction is inexplicable in light of his knowledge as a union representative.
 
 
 49
 Given these facts, Darin has not proven unfair representation. Appellant has the burden of showing that the Union's conduct toward him was arbitrary, discriminatory or in bad faith. Vaca v. Sipes, 386 U.S. 171, 190 (1967); Humphrey v. Moore, 375 U.S. 335, (1964).
 
 
 50
 A review of appellant's complaint reveals that at no time has it been alleged that the Union treated the plaintiff in a hostile, discriminatory, arbitrary or capricious fashion. The complaint failed to allege any facts whatsoever showing or tending to show that hostility or malice on the part of the Union motivated its alleged failure to either notify the Employer of his alternate committeeman status or to adequately advise plaintiff of his rights under the collective bargaining agreement. On the basis of the facts alleged in the complaint, the most damaging conclusion which could be drawn against the Union is that it negligently failed to notify the employer of plaintiff's alternate committeeman status. Facts showing that the Union may have acted negligently or exercised poor judgment are not enough to support a claim of unfair representation. See, e.g., Dill v. Greyhound Corporation, 435 F.2d 231, 237-38 (6th Cir. 1970) (no violation by union because no finding of hostility, malice, or bad faith on part of union); see also Besedick v. LTV Aerospace Corp., 433 F. Supp. 954 (E.D. Mich. 1977) (union bad faith cannot be established merely by showing a mistake in judgment). The trial court ruled that while the Union's failure to notify the employer may have been an 'oversight' or even 'negligent', that failure did not rise to the level of a breach of the duty of fair representation. Ordinary negligence alone is not sufficient to establish a breach of the duty of fair representation. Ruzicka v. General Motors Corporation (Ruzicka I), 523 F.2d 306 (6th Cir. 1975) (wanton disregard or gross negligence required to find a breach of the duty of fair representation); Ruzicka v. General Motors Corporation (Ruzicka II), 649 F.2d 1207 (6th Cir. 1981).
 
 
 51
 The trial court's analysis is correct. There is not doubt that the duty of fair representation was never intended to cover each and every act taken by a labor organization during the representational relationship. No organization can be held strictly accountable for all its activity however ministerial. As the trial court correctly suggested, action taken under color of the collective bargaining agreement would subject the union/management relationship to constant judicial scrutiny and intervention. The goal of federal labor policy is to insure fair representation, not infallible representation. See, Vaca v. Sipes, 386 U.S. 171 (1967).
 
 
 52
 However, even assuming the Union was somehow responsible for assuring that each and every action connected with the unit election was carried out unerringly, appellant still fails to state a meritorious claim. The Union's alleged negligent failure to notify the employer of the plaintiff's elected status did not bar him from a timely resort to the grievance procedure when he first questioned the appropriateness of his layoff.
 
 
 53
 Accordingly, the judgment of the Honorable Ralph B. Guy, United States District Court of the Eastern District of Michigan, is hereby affirmed.